**CHESTNUT HILL GULF, INC., et al., Plaintiffs,**

v.

**CUMBERLAND FARMS, INC., Defendant.**

**Civ. A. No. 91–13342–S.**

United States District Court, D. Massachusetts.

Feb. 10, 1992.

James T. Finnigan, Withington, Cross, Park & Groden, Edwin John Carr, Rich, May, Bilodeau & Flaherty, Boston, Mass., for plaintiff and counter-defendant.

John B. Williams, Collier, Shannon & Scott, Washington, D.C., for defendant and counter-claimant.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

SKINNER, District Judge.

Plaintiff franchisees bring this action against defendant franchisor, Cumberland Farms, Inc. ("Cumberland"), pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et seq. Plaintiffs allege that Cumberland violated § 2802(b)(3)(A) of the PMPA by failing to offer acceptable renewal terms for their Gulf service station franchises. Pursuant to PMPA § 2805, plaintiffs seek a preliminary injunction restraining Cumberland from terminating or failing to renew the franchises.

*Background*

In late 1985, Chevron sold to Cumberland its real property and leasehold interests in over 500 retail Gulf gasoline service sta-

tions, including those operated by plaintiffs. The transfer preserved the franchisees' rights to use the Gulf trademark, to occupy their service stations, and to purchase Gulf gasoline.

Upon the expiration of each Gulf franchise agreement assigned to Cumberland, Cumberland offered that franchisee a new franchise agreement. In the new leases, Cumberland uniformly set the monthly rent at one-twelfth of the sum of (a) the fair market value of the property multiplied by an 11% rate of return on the value of that property and (b) the taxes on the property. Approximately one hundred twelve of the Gulf leases expired prior to October 1986, and for these Cumberland utilized in-house appraisals (the "Hartman appraisals"). For the approximately three hundred eighty eight leases that expired after October 1986, Cumberland hired an independent appraiser.

If any Gulf franchisee believed that Cumberland's valuation of the market value of his service station premises was too high, the franchisee could participate in Cumberland's rental review program, under which a franchisee can proffer a new valuation by obtaining an appraisal by a professional real estate appraiser from a list provided by Cumberland. If Cumberland disagrees with the franchisee's valuation, Cumberland is entitled to have another appraisal conducted under the same criteria. Unless the difference between the dealer's appraisal and Cumberland's second appraisal is more than ten percent of the higher of the appraisals, the average of the two appraisals will be used. If the difference between the dealer's appraisal and Cumberland's second appraisal is more than ten percent of the higher of the appraisals, Cumberland and the dealer then mutually appoint a third appraiser, and the value assigned to the premises is the average of all three appraisals.

On December 8, 1986, eighteen of 52 Massachusetts Gulf dealers rejected the revised franchise terms offered by Cumberland, and filed suit in this court alleging that Chevron and Cumberland had terminated or failed to renew their franchises in

violation of the PMPA.[1]  That action was entitled *Chestnut Hill Gulf, Inc. et al. v. Cumberland Farms, Inc. and Chevron U.S.A., Inc.*, C.A. No. 86–3519–Mc ("Chestnut Hill Gulf I").  All five plaintiff franchisees in the present action were also plaintiffs in Chestnut Hill Gulf I.  In the prior litigation, plaintiffs asserted two theories of liability under the PMPA.  First, plaintiffs claimed that Chevron's transfer of marketing assets to Cumberland constituted a "termination or nonrenewal" of their franchise agreements and that this "termination or nonrenewal" could not be justified under the affirmative defense of market withdrawal set forth in PMPA § 2802(b)(2)(E).  Pursuant to § 2802(b)(2)(E), a company which purchases franchise locations from a withdrawing franchisor must offer each existing franchisee, in good faith, a new, nondiscriminatory franchise.  Plaintiffs argued that their franchises had been terminated by virtue of the Chevron–Cumberland sale and that Cumberland, as the new franchisor, did not offer them new nondiscriminatory franchises in good faith.

Second, all plaintiffs alternatively argued that the renewal franchise terms offered by Cumberland were so burdensome that they constituted a bad faith "constructive nonrenewal" for which Cumberland had no valid affirmative defense under PMPA § 2802(b)(3)(A).  That section provides that a franchisor may refuse to renew a franchise when the parties cannot agree to "changes or additions" to the franchise agreement and such "changes or additions" are offered by the franchisor "in good faith and in the normal course of business … [and not] for the purpose of preventing nonrenewal of the franchise."

Shortly after the complaint in Chestnut Hill Gulf I was filed, the district court entered a series of "status quo" injunctions that allowed the plaintiffs to continue to operate their franchises under the terms of the "old Gulf" franchise agreements with Chevron, instead of the renewal terms offered by Cumberland.  The injunction was eventually extended so as to remain in ef-fect until the conclusion of trial.  Plaintiffs were not required to post a bond in connection with the status quo injunction.

In Chestnut Hill Gulf I, Chevron and Cumberland separately moved for summary judgment on the ground that as a matter of law the PMPA did not apply to the franchise assignments, or if it did, Chevron had affected a proper "market withdrawal" under § 2802(b)(2)(E) and Cumberland had offered a good faith non-discriminatory franchise to each of plaintiffs.  Cumberland also asked for summary judgment on the basis that it had met the requirements of § 2802(b)(3)(A) for valid nonrenewal of the franchises.

The district judge denied Chevron's and Cumberland's motions for summary judgment.  The court held "as a matter of law, that the assignment from Chevron to Cumberland constituted a nonrenewal of the franchise relationships between Chevron and the plaintiffs.…"  The court also ruled that "the issues raised [by plaintiffs] are material to Cumberland's good faith and nondiscrimination and that therefore summary judgment is not appropriate on market withdrawal grounds.  This holding extends to Cumberland's assertion of the § 2802(b)(3) defense where its 'good faith' is also implicated."

At trial, the jury findings combined with the district court's pretrial rulings resulted in Chevron and Cumberland being held liable under § 2802(b)(2)(E), as to thirteen plaintiffs.  Among these thirteen were four plaintiffs in the current action: Chestnut Hill Gulf, Inc., Al Stander's Gulf Service, Inc., Russel Killion ("Russ' Gulf"), and Thomas Galbraith ("Cleveland Circle Gulf").  The jury findings and the district court's pretrial rulings also resulted in Cumberland separately being held liable under § 2802(b)(3)(A) as to the three remaining plaintiffs.  One of these three plaintiffs, Willow Street Auto Repairs, Inc. ("Bob's Gulf") is a plaintiff in the present action.

On July 29, 1991, the court of appeals reversed the (b)(2)(E) judgments of the dis-

---

**1.** Two of these plaintiffs were dismissed on     their own motions.

trict court in favor of the thirteen plaintiffs. *Chestnut Hill Gulf, Inc. v. Cumberland Farms*, 940 F.2d 744 (1st Cir.1991). The court of appeals ruled that "the district court erred as a matter of law in its pretrial ruling and instruction to the jury," *id.* at 752, and that the assignment of Chevron's franchises to Cumberland did not implicate the PMPA. *Id.* at 750. The court of appeals also reversed the (b)(3)(A) judgments as to the remaining three plaintiffs, holding that the PMPA had been complied with, to the extent applicable. 940 F.2d at 752–53.

On August 22, 1991, Cumberland again offered renewal franchise packages to all the plaintiffs from Chestnut Hill Gulf I. For each franchise renewal offer, Cumberland set the monthly rent according to the same uniform formula it uses for all its Gulf franchises, and with which Cumberland had determined the renewal rates at issue in Chestnut Hill Gulf I. Once again the independent appraisals were used instead of the Hartman appraisals. Once again Cumberland offered each franchisee a chance to challenge the appraisals used to set rents by participating in Cumberland's rental review program.

The August 22 renewal offers also included demands for back rent from October 13, 1988 (date of initial denial of summary judgment by the district court in Chestnut Hill Gulf I) through July 1991. The back rent amounts were purportedly calculated by subtracting the rent that the former plaintiffs actually paid during the rent freeze in effect during Chestnut Hill Gulf I, from the amounts they would have paid under the franchise renewal agreements previously offered by Cumberland. Cumberland agreed to accept the payment of back rent on a monthly basis over an extended period of time, exclusive of interest. Cumberland requested, however, that each dealer's spouse sign a continuing guaranty of her husband's business obligations to Cumberland.

Nine of the sixteen former plaintiffs from Chestnut Hill Gulf I accepted the new franchise packages. Two of the plaintiffs chose to vacate their service stations voluntarily. Five other former plaintiffs refused to agree to the franchise renewal terms. All five chose not to participate in Cumberland's rental review program to contest the Cumberland appraisals used to determine their monthly rents.

On September 30, 1991, Cumberland Farms provided each plaintiff written notice of nonrenewal of plaintiffs' franchisees pursuant to PMPA § 2804. In each notice, Cumberland Farms stated that "the specific ground for nonrenewal" was the failure of the franchisee "to agree to changes or additions to the provisions of the franchise," citing PMPA § 2802(b)(3)(A). Each notice further stated that the nonrenewal would become effective January 8, 1992.

On December 20, 1991 plaintiffs filed their complaint in this action and moved for a preliminary injunction preventing Cumberland from failing to renew on a month-to-month basis the old Gulf franchise agreement of each plaintiff. Plaintiffs argue that Cumberland's threatened nonrenewal fails to comply with requirements of § 2802(b)(3)(A), and thus the plaintiffs are entitled to injunctive relief under PMPA § 2805(b). Among the reasons plaintiffs offer in support of their (b)(3)(A) claim of Cumberland's lack of good faith are Cumberland's reliance on independent appraisals as opposed to the Hartman appraisals or more recent appraisals to set monthly rents, Cumberland's demand that each plaintiff pay back rent, and Cumberland's request that plaintiffs' spouses sign the continuing guaranties.

*Discussion*

PMPA § 2805(b)(2) provides that in any enforcement action brought pursuant to the act,

the court shall grant a preliminary injunction if—

(A) the franchisee shows

(i) the franchise of which he is a party ... has not been renewed, and

(ii) there exists sufficiently serious questions going to the merits to make

such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

■■■ The provisions of the PMPA "must be given 'a liberal construction consistent with its overriding purpose to protect franchisees.'" *Chestnut Hill Gulf,* 940 F.2d at 750 (citing *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989)). However, because the PMPA "diminishes the property rights of franchisors, the Act 'should not be interpreted to reach beyond its original language and purpose.'" *Id.* (citing *May–Som Gulf,* 869 F.2d at 921 and *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988)). Although a plaintiff need not show the normal prerequisites of irreparable harm and a probability of success on the merits to be entitled to injunctive relief under § 2805(b)(2), *Mobil Oil Corp. v. Vachon,* 580 F.Supp. 153, 156 (D.Mass.1983), he is required to demonstrate "sufficiently serious questions going to the merits" or "some reasonable chance of success on the merits." *Id.* (citing *Saad v. Shell Oil Co.,* 460 F.Supp. 114, 116 (E.D.Mich.1978)).

■■■ On the merits, plaintiffs have the burden of proving "the termination of the franchise or the nonrenewal of the franchise relationship," pursuant to PMPA § 2805(c), before the enforcement provisions of the PMPA are triggered. Upon such proof, "the franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b)...." 15 U.S.C. § 2805(c). Thus, to qualify for preliminary injunctive relief under § 2805(b)(2), the franchisee must rebut the franchisor's evidence that the termination or nonrenewal was permissible, by showing the existence of sufficiently serious questions as to the propriety of the termination under the

PMPA to present a fair ground for litigation. *See Khorenian v. Union Oil Co.,* 761 F.2d 533, 536 (9th Cir.1985).

Pursuant to PMPA § 2802(b)(3) the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

■■■ The test of good faith under § 2802(b)(3) is "whether the franchisor had acted in subjective 'good faith' in requesting the changes, and not whether the demanded changes were the result of 'reasonable business judgments' on the part of the franchisor." *Esso Standard Oil Co. v. Dept. of Consumer Affairs,* 793 F.2d 431, 432 (1st Cir.1986) (citing 1978 U.S.Code Cong. & Ad.News, 873, 895–96.) In *Esso Standard Oil,* the First Circuit Court of Appeals explained that since the good faith requirement of § 2802(b)(3)(A)

requires merely that a franchisor not act 'with evil motive or discriminate[ ] selectively against franchisees', courts have upheld franchisor demands for rent increases ranging from 100% to 300% when those demands were made in accord with established rental formulas applied to all franchisees and not for the purpose of selectively terminating a particular franchisee.

*Id.* (citations omitted).

■■■ Assuming for the purpose of deciding plaintiffs' motion that plaintiffs' § 2802(b)(3)(A) claims are not barred by the preclusive effect of Chestnut Hill Gulf I and that plaintiffs have made their required showing under §§ 2805(b)(2)(A)(i) and 2805(b)(2)(B), I find that plaintiffs fail to demonstrate a reasonable chance of success on the merits with their overall claims

that Cumberland failed to offer changes and additions to their franchise agreements in good faith, in the ordinary course of business, and not for the purpose of preventing the franchise relationship. Of the three main examples that plaintiffs' offer as evidence of Cumberland's § 2802(b)(3)(A) violation, only the requirement of a spousal guaranty presents "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." Section 2805(b)(2)(A)(ii). This issue was not raised in Chestnut Hill Gulf I.

Plaintiffs' argue that Cumberland's substantial increases in rental payments that are based upon independent appraisals, as opposed to the Hartman appraisals utilized for some of the other dealers, evidences Cumberland's lack of subjective good faith. Plaintiffs also argue that Cumberland should not be allowed to use appraisals which value the leased premises at their highest and best use rather than as gasoline service stations. I disagree. Cumberland's rental amounts were set in accord with its established rental formula applied uniformly to all its franchises. If plaintiffs felt that the outside appraisals which Cumberland used were too high, Cumberland's rental review program allowed each to contest the appraisals by offering their own. None of the plaintiffs in this action chose to do so. Furthermore, nothing in § 2802(b)(3)(A) prevents a franchisor from appraising his leased premises at their highest and best use rather than just as gasoline service stations. No lack of good faith is shown merely because a franchisor chooses to appraise his leased properties in a way that reflects the opportunity cost of leasing such premises as service stations as opposed to a more efficient, i.e. profitable, use. *See Esso Standard Oil Co.,* 793 F.2d at 432; *Ackley v. Gulf Oil Corp.,* 726 F.Supp. 353, 368–69 (D.Conn.1989), *aff'd,* 889 F.2d 1280 (2d Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990); *Baldauf v. Amoco Oil Co.,* 553 F.Supp. 408, 412 (W.D.Mich.1981), *aff'd,* 700 F.2d 326 (6th Cir.1983) ("[W]hile changes in the conditions for renewal may produce harsh results ... Congress intended to protect the franchisee from *arbitrary* or *discriminatory* termination or nonre-

newal, and did not provide a basis to examine the economic impact of an otherwise legitimate business decision by the franchisor.") (emphasis in original).

Plaintiffs also contend that Cumberland's lack of good faith and intention to prevent the plaintiffs from renewing their franchises are shown by Cumberland's demand for payments of back rent. Plaintiffs argue that Cumberland has no legal right to such back rent since it did not make a counterclaim for it in the prior litigation, and because no injunction bond had been required in Chestnut Hill Gulf I.

■ "It is clearly established that a party need not assert a counterclaim that has not matured at the time he served his pleading.... [and a] counterclaim acquired by a defendant after he has answered is not compulsory, even if it arises out of the same transaction as does plaintiff's claim." *Boston and Maine Corp. v. United Transp. Union,* 110 F.R.D. 322, 328 (D.Mass.1986) (citing 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1411, at 55 (1971)). As Cumberland's claim to back rent starting from October 13, 1988 arose after it filed its answer in Chestnut Hill Gulf I, Cumberland's claim for back rent is not barred as a compulsory counterclaim that Cumberland failed to raise in that action.

■ Cumberland seeks restitution for the effects of an injunction maintaining the status quo entered by the district court. When a party has received money or property by virtue of an injunction subsequently reversed, he may be compelled to make restitution even in the absence of an injunction bond. *See Caldwell v. Puget Sound Electric Apprenticeship & Training Trust,* 824 F.2d 765, 767 (9th Cir.1987) (citing *Buddy Systems, Inc. v. Exer–Genie, Inc.,* 545 F.2d 1164, 1167 (9th Cir.1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977)). *See generally* Restatement of Restitution, Judgments Subsequently Reversed, § 74, at 302–03 (1936) ("A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless

restitution would be inequitable...."). Cumberland's request for back rent from October 13, 1988, the date that summary judgment was initially denied to Cumberland in the prior litigation, to the present, reveals no serious question about Cumberland's good faith in making such a demand. Cumberland is merely treating plaintiffs in the same way it treats the other former plaintiffs from Chestnut Hill Gulf I, as well as the other Massachusetts Gulf dealers who accepted Cumberland's rent formula from the beginning.

 Plaintiffs additionally claim that Cumberland's request for the dealers' spouses to sign continuing guaranties evinces Cumberland's lack of good faith. Unlike plaintiffs' other grounds for injunctive relief, plaintiffs' allegation of bad faith on this point has some reasonable chance of success on the merits. Federal Reserve Board Regulation B ("Regulation B"), 120 C.F.R. § 202 *et seq.* provides that a creditor "shall not require the signature of an applicant's spouse ... on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 120 C.F.R. § 202.7(d)(1). Creditor is defined as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit." 120 C.F.R. § 202.2(I).

On the facts before me, it is unclear whether or not Cumberland is a creditor for purposes of Regulation B. I find that plaintiffs have presented a serious question going to the merits to make such question a fair ground for litigation. I also find that the balance of hardships favors granting plaintiffs a preliminary injunction with respect to Cumberland's demand for continuing guaranties from plaintiffs' spouses.

ACCORDINGLY, Cumberland is hereby enjoined from requiring such continuing guaranties as a precondition to renewing plaintiffs' franchisees, until further order of the court. The plaintiffs' motion is otherwise denied.